WADSWORTH v. PRESSED PRISM PLATE GLASS CO.

(Circuit Court of Appeals, Fourth Circuit. November 16, 1916.)

No. 1425.

1. PATENTS ⬅︎202(1), 218(1)—ASSIGNMENT—CONSTRUCTION OF CONTRACT.

A contract by which complainant assigned to defendant, a manufacturer, a number of patents ,relating to the manufacture of glass, construed with respect to royalties reserved, and under the facts found, and a provision allowing it free use of the patented inventions up to a stated quantity of product, defendant *held* not liable for royalties. *Held*, further, that under the terms of the contract complainant was not entitled to a reassignment of certain of the patents because of their nonuse by defendant, and that defendant was not therefore liable in damages for their depreciation in value.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 281–288, 330, 333, 336–338; Dec. Dig. ⬅︎202(1), 218(1).]

2. PATENTS ⬅︎202(1)—ASSIGNMENT—CONSTRUCTION OF CONTRACT.

Under a further provision of the contract that defendant should pay all expenses incidental to obtaining patents on pending or future applications by complainant, provided that such "expenses shall be authorized by the company," defendant was not required to take appeals from the action of the Patent Office denying any such applications, or to pay taxes necessary to keep foreign patents granted in force, if in its business judgment such action was not justified.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 281–288; Dec. Dig. ⬅︎202(1).]

3. CORPORATIONS ☞573(3)—REORGANIZATION—CONTRACT BETWEEN ASSENT-
ING STOCKHOLDERS.
    Where complainant, a stockholder and director of defendant corpora-
tion, was also chairman of a reorganization committee, and as such wrote
and signed a proposed plan of reorganization, which was submitted to and
accepted by all stockholders, he was bound by the contract so made, and
entitled to no greater proportionate share of the new stock in exchange
for his old stock than the other stockholders.

    [Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2296; Dec.
Dig. ☞573(3).]

Appeal from the District Court of the United States for the North-
ern District of West Virginia, at Parkersburg; Alston G. Dayton,
Judge.

Suit in equity by Frank L. O. Wadsworth against the Pressed Prism
Plate Glass Company. Decree for defendant, and complainant ap-
peals. Affirmed.

Frederick W. Winter, of Pittsburgh, Pa., for appellant.
Charles Neave, of New York City, and Mason G. Ambler, of Par-
kersburg, W. Va. (Alan N. Mann, of New York City, on the brief),
for appellee.

Before PRITCHARD and KNAPP, Circuit Judges, and JOHN-
SON, District Judge.

JOHNSON, District Judge. Frank L. O. Wadsworth, plaintiff, filed
his suit in equity against the Pressed Prism Plate Glass Company, de-
fendant, in the District Court for the Northern District of West Vir-
ginia. He will hereafter be referred to as the plaintiff, and the plate
glass company as the defendant, that being the position they occupied
in the District Court. The object of the plaintiff's bill was to secure
relief which he alleged he was entitled to against the defendant in the
following particulars:

First, for the reassignment to the plaintiff of the 1905 contract pat-
ents because of defendant's failure to either use the same in whole or
in part or to accept reasonable license offers for some or all of said
patents.

Second, damages for depreciation in the value of said patents due
to the defendant's failure to either use or allow others to use the same,
or to reassign them to the plaintiff.

Third, the reissue to the plaintiff of a number of shares of the cap-
ital stock of the defendant company which plaintiff alleged that he
was induced by the defendant to surrender in a reorganization of the
company for the purpose of raising capital to put in use the contract
inventions, and which he alleges was never used for that purpose.

Fourth, damages for losses suffered by the plaintiff by defendant's
action in allowing certain of the contract patents and applications for
patents to abandon and become forfeited, in consequence of which
plaintiff's reversionary rights therein were destroyed.

Fifth, an accounting for and payment of royalties under the said
contract for use in part of certain contract inventions.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Upon the coming in of the answer of the defendant, the cause was referred to a master to take testimony and report his findings of fact and conclusions of law to the court. After the taking of the testimony and the argument of counsel, the master filed a report which was very full, elaborate, and clear. Plaintiff filled numerous exceptions to the master's report, and the defendant filed one exception. The District Court, after argument of counsel and consideration of the cause, over-ruled all exceptions and confirmed the master's report. Whereupon a short order was entered dismissing the plaintiff's bill. The material part of the master's report is as follows:

The plaintiff, Frank L. O. Wadsworth, is an engineer, and has for a number of years been an expert in the glass art, particularly in the specific art of optical and illuminator glass, and has made many inventions in and pertaining to the glass art, and particularly to what is known as prism glass and ornamental glass, and has applied for and taken out a large number of patents of the United States and foreign countries relative and pertaining to said art. The defendant, Pressed Plate Glass Company, is a corporation chartered and organized in the year 1902 under the laws of West Virginia, and having its chief (and only) works at Morgantown, Morgan district, Monongalia county, W. Va.

On September 1, 1902, the plaintiff and the defendant entered into a written contract containing the following provisions which seem pertinent here:

"The party of the first part [plaintiff] agrees:

"1. To assign and transfer to the party of the second part [defendant] all patents, inventions, devices, and processes relating in any way to the manufacture or production of any kind of glass or articles made of glass, or to any machinery, tools, or processes or devices for making, producing, treating, or assembling glass or glass articles of any kind, which, at any time during the period between February 1, 1898, and September 1, 1907, he has made or may make, devise or acquire" [with certain exceptions not material in this case].

"2. To sign and execute, upon request of the party of the second part, all papers necessary or convenient to properly effectuate such assignment and transfer, including applications for letters patent for any of said inventions, devices or processes."

"3. [Not material here.]

"4. That the party of the first part shall not be required, during said period of five years, to devote or give any of his time or services to the party of the second part. [Here follows immaterial matter.] "

The recited consideration for this contract was $1. The real consideration paid to the plaintiff consisted of capital stock of the defendant company to the par value of $104,000. Soon after its organization the defendant company entered upon the manufacture of glass, operating very largely under patents transferred to it under the contract above referred to.

It soon developed that the defendant company was unable to successfully carry on its operations without the active services of the plaintiff, and accordingly he was called upon for aid. This was a sore disappointment to him, as it was his desire to be left free to practice his profession in Pittsburgh. However, he was induced to give much of his time to the service of the defendant, and finally was persuaded to give up his professional work in Pittsburgh and to assume entire charge of the manufacturing operations at Morgantown. The plaintiff continued at the head of these operations until August, 1905, when he resigned. He retained, however, his place upon the directorate, which he had occupied from the formation of the company in 1902, and which he continued to occupy until the year 1913, when he resigned and sold all his stock interest.

It appears that during the whole history of the relations between the parties to this suit, those relations have been strained. At the very outset the plaintiff complained bitterly that it became necessary for him to give up his

work at Pittsburgh in order that the mechanical operations at Morgantown might succeed. He claims that this necessity arose because of negligence on the part of those in charge of the company's affairs, and that "the only alternative was to see all my interests lost by utterly incompetent management." Another source of trouble between the plaintiff and defendant was a certain sales contract entered into with the Luxfer Prism Company, under which that company, a competitor of the defendant, was given control of the sale of the defendant's product. This contract with the Luxfer Company was made against the plaintiff's protest, and he has always claimed that it was exceedingly unwise and that it resulted in great loss. It was the controversies arising between the plaintiff and the officers of the defendant company over this Luxfer contract that finally led to the plaintiff's resignation from the management of the company's plant in August, 1905. During that period of his employment at Morgantown, the plaintiff made a number of additional inventions relating to devices, processes, articles, etc., in connection with the glass industry, and filed a large number of applications for patents thereon, some of which applications had eventuated in patents at the time of the plaintiff's resignation above referred to in August, 1905. These inventions, applications, and patents were not turned over to the defendant company.

When the plaintiff resigned from the management of the defendant's plant in August, 1905, he notified the defendant company that he considered that it had violated the contract of September 2, 1902, and that it had therefore forfeited any rights which it had in any invention of his made subsequent to the date of that contract. There was considerable discussion growing out of this claim on the part of the plaintiff, some of it even before the plaintiff's resignation and formal notice. The defendant company claimed that under the contract of 1902 it was entitled to the inventions and patents in question, and the plaintiff claimed that it was not, but that it had forfeited its rights in that connection. The resignation of the plaintiff brought this dispute to a head, and his notification to the defendant was followed by a suit between the company and himself. This suit was settled in the fall of 1905 by the abrogation of the contract of September, 1902, and the execution of a new contract in lieu thereof bearing date October 27, 1905. This settlement was had and the contract of October 27, 1905, was executed for the purpose of compromising and settling the points at issue. Article 1 of the contract of 1905 provides as follows:

"The agreement in writing heretofore executed by and between the parties hereto and dated September 1, 1902, is hereby annulled and canceled and the provisions thereof are entirely substituted by the provisions and agreements of this present contract."

Under this compromise contract of October 27, 1905, the plaintiff did assign to the defendant the inventions, applications, and patents which were in dispute; and the defendant, on its part, entered into certain agreements with the plaintiff with regard to the said inventions, applications, and patents, and also employed the plaintiff as consulting engineer and expert at an annual retainer of $1,000 per year up to and including the year 1907, and agreed to pay him for any work which it might call upon him to perform at a rate to be agreed upon between the parties in each particular case. This contract of October 27, 1905, is Exhibit A of the bill of complaint.

This suit has two main branches or divisions, which may readily be considered separately, the one from the other. The first of these branches has to do with the last-mentioned contract. In the other branch the plaintiff seems to secure the residue to himself of certain shares of stock surrendered by him under a certain reorganization agreement hereinafter more specifically referred to. That branch of the case having to do with the contract of October 27, 1905, will be considered first. Under this head the plaintiff seeks:

(1) An accounting and payment to him of royalties claimed to be due for product manufactured by the defendant in which use was made of certain inventions covered by patents which were assigned by the plaintiff to the defendant in said contract.

(2) The reassignment to him of certain patents and applications for patents which were assigned by the complainant to the defendant in the said contract

and which cover inventions which have not been substantially used by the defendant.

(3) To recover as damages the depreciation in value of the said patents of which no substantial use has been made.

(4) To recover damages on account of the abandonment by the defendant of certain applications and foreign patents which were assigned by the said contract.

These claims will be considered in their order.

[1] *First.* Is the complainant entitled to an accounting of royalties on product manufactured by the defendant in which use was made of inventions covered by patents which were assigned by the complainant to the defendant under the contract of October 27, 1905?

The plaintiff's claim for royalties is based on section 4 of the contract, which reads as follows:

"4. The company agrees to pay to Wadsworth one-fourth of the gross amount received by it from each and every license granted under any of the letters patent or patent applications covered by this agreement; payments to be made within 30 days from the end of each quarter. The company also agrees that, if it uses any of the inventions covered by the letters patent herein referred to, it will pay to Wadsworth a royalty rate that shall be one-fourth of the minimum royalty rate that shall be paid to it by other using under corresponding licensed conditions such and such invention or inventions, and that if no such license has been granted by the company, then the company shall pay to Wadsworth, as a minimum license fee or royalty, *1 per cent. of the amount received by this company or any subsidiary company for sales of the product in question.* In case the company sells any one of their herein mentioned patents, it shall pay to Wadsworth one-fourth of the gross consideration in kind received. It being specifically provided, however, that Wadsworth is to receive no royalty for the use of the grinding and polishing machines referred to in applications serial Nos. 233,582, filed November 21, 1904; 255,863, filed April 17, 1905; 266,695, filed June 24, 1905; and 266,-696, filed June 24, 1905—or any improvements thereon when said grinding machines are used in grinding or polishing any form of glass covered by the letters patent issued to Wadsworth and turned over to the company at the time of its formation September 1, 1902, or any improvements thereon, and it is further specifically provided that the company shall have free right to use at its present factory in the district of Morgan aforesaid, W. Va., with a capacity not to exceed 2,000,000 square feet per year, but not elsewhere, any of the inventions herein referred to up to the product of 500,000 square feet per year in the aggregate, above which amount the above-provided royalty shall be paid."

There is a wide difference between the construction which the plaintiff seeks to have placed on this section, and the construction which is sought to be placed on it by the defendant. But before taking up the subject of the construction of section 4, as applied to the facts as found by the master, it is necessary that those facts be set forth. They are as follows:

### Finding of the Facts.

(1) The defendant has not granted any license to others for using any of the inventions covered by the contract in suit, neither has it sold any of the patents covered by that contract. This is conceded by both parties.

(2) The only place at which the defendant has used any of the inventions covered by the contract is at its factory at Morgantown. This is also conceded.

(3) The large majority of the inventions covered by the contract have not been used by the defendant. This is conceded by both parties.

(4) It is conceded by both parties that prior to the year 1914, the capacity of the defendant's plant did not exceed 2,000,000 square feet of glass per year. It was shown, however, that in 1914 the defendant company installed a new casting machine and erected a new melting tank. It is clear that the capacity of this melting tank exceeds 2,000,000 square feet of glass per year. It also appears that the capacity of the casting machines including the new one

erected early in 1914 probably exceed 2,000,000 square feet. I think, however, it is clear that the capacity of the lehr, through which all glass must pass, is considerably below the 2,000,000 mark, as is also the capacity of the grinding and polishing machines. I am of opinion, therefore, that the capacity of the plant taken as a whole does not reach 2,000,000 square feet per year.

This holding is sustained by the positive testimony of the only witness who testified on the subject of the sustained capacity of the plant (Mr. Ross).

(5) The parties agree that the defendant has used the invention of what is known as the "casting hall patent," which is numbered 952,390 and is a patent for a process and apparatus for manufacture of plate glass. They also agreed that the defendant has used 'the inventions described in the four patents numbered 845,987, 852,403, 891,197, and 891,198, this patent being for a grinding and polishing apparatus.

(6) The plaintiff also claims, and the defendant denies, that in the production of what is known as its "ornamental prism glass" and its "special design glass with an obscure background," the defendant has used the article invention described in patent numbered 818,208 for reinforced ornamental prism glass; the claim of the defendant being that, notwithstanding the design of ·this glass may be comprehended within the claims of the patent in question, yet it is also comprehended within the scope of prior patents issued to other parties, and should therefore be held to be outside the scope of the patent in question. It is my opinion, and I therefore hold, that this contention on the part of the defendant is not well taken, and that in the production· of the glass in question the invention of patent numbered 818,208 is used.

(7) As to the extent of the use by the defendant of the invention of the "casting hall patent" there is considerable conflict. It is admitted by the defendant that this invention is used in the casting of its "ornamental glass" and "polished plate prism glass." The plaintiff contends that it is also used in the casting of "special design glass" and "rough skylight prism glass." With this contention of the plaintiff I cannot agree, it being my opinion that it appears from the evidence (1) that in the casting of these products by the use of several small dies on the same backing plate, even though that back plate be concave, concavity is not used or useful for the maintenance of parallelism, and (2) that the application of a low degree of heat to the dies, as heat is applied by the defendant, is not intended, nor is it sufficient, for the purpose of preventing any "substantial transfer of heat from the glass to the pressing element," but merely for the purpose of preventing the chilling of the surface of the glass.

(8) It clearly appears from the evidence that there is no record kept of the number of square feet of glass actually pressed by the casting hall device. Immediately following the pressing of·this glass the sheets are put through the lehr, or annealing furnace, and are then squared up for what are called the rough racks, these racks holding the sheets pending their submission to the grinding and polishing machines. A record is kept of the square footage of the several kinds of glass squared up at the end of the lehr and placed in the rough racks. From this record it appears that during the year 1912–1913 there were placed in the rough racks the following number of square feet of glass cast by the use of the casting hall invention:

Ornamental prism.......................................443,292 sq. ft.
Plate prism.............................................. 96,668 sq. ft.

539,460 sq. ft.

(It is important to note that the only evidence in the case as to the square footage of glass produced by the use of inventions of the plaintiff related to the year commencing on the 1st day of April, 1912, and ending on the 31st day of March, 1913.)

(9) From the evidence it appears that during the year in question the Wadsworth patent grinding and polishing machines were used in operating upon 127,463 square feet of glass, but of this total footage 24,980 square feet was plate prism glass, which was produced under an article patent assigned

to the defendant under the contract of September 1, 1902. Under the allowance clause contained in section 4 of the contract of October, 1905, glass so produced is not to be considered in estimating the footage operated upon by the grinding and polishing machines. It therefore appears that during the twelve months from April 1, 1912, to March 31, 1913, the Wadsworth grinding and polishing machines were used upon 102,483 square feet of glass of forms other than those specified in the allowance clause.

(10) It appears from the evidence that little, if any, of the glass produced by the defendant company, is finished and salable until operated upon by the company's grinding and polishing machines, except glass letters and skylight prism glass; but in designing and casting glass letters and skylight prism glass none of the patents assigned under the contract of October, 1905, are used. It therefore seems clear that the total amount of finished product upon which inventions covered by the 1905 contract were used in the year 1912–1913 cannot have been in excess of the total amount operated upon by all of the defendant's polishing and grinding machines. (There are five of these machines, one of which was not built under any patent covered by the 1905 contract.)

Now the total amount of glass operated upon by these five machines in the year 1912–1913 was 527,406 square feet. But it appears from the evidence that, as to one kind of glass which was ground and polished, the Wadsworth machines were not used. I refer to the "clear fluted special design." None of this glass was either designed, cast, or polished by the use of any of the patents covered by the 1905 contract. The amount of this glass that was produced was 51,785 square feet. It seems, therefore, that the total amount of finished product produced by the use of any of the contract inventions during the year in question cannot have been in excess of 527,406 square feet minus 51,785 square feet—that is, a net total of 475,621 square feet.

(11) The total amount of glass sold by the defendant during the year 1912–1913 was 340,000 feet.

### Construction of Section 4 of the Contract.

It is important to bear in mind that the defendant has neither granted any licenses to use any of the inventions covered by the contract nor sold any of the contract patents. Therefore, as bearing on the questions here involved, section 4 of the contract reads as follows:

General provision: "The company agrees that, if it uses any of the inventions covered by the letters patent herein referred to,  *  *  *  it will pay to Wadsworth as a minimum fee or royalty, 1 per cent. of the amount received by this company or any subsidiary company for sales of the product in question."

Supplemental clause (a): "It being specifically provided, however, that Wadsworth is to receive no royalty for the use of the grinding and polishing machines (the patents for which are included in the contract)  *  *  *  when said machines are used in grinding or polishing any form of glass covered by letters patent issued to Wadsworth and turned over to the company at the time of its formation, September 1, 1902.  *  *  * "

Supplemental clause (b): "And it is further specifically provided that the company shall have free right to use at its present factory (at Morgantown), with a capacity not to exceed 2,000,000 square feet per year, but not elsewhere, any of the inventions herein referred to up to the produce of 500,000 square feet per year in the aggregate, above which amount the above provided royalty shall be paid."

### Plaintiff's Contention.

The plaintiff contends that the above general provision merely fixes the rate of royalty (that is, 1 per cent. of the selling price), and that if that provision were considered alone it would obligate the defendant to pay to the plaintiff a royalty of 1 per cent. of the selling price on the entire product of the defendant in the production of which any of the contract inventions were used, even though only a fraction of that product were sold. He also maintains that supplemental clause (b) does not give to the defendant the free right to sell or even to produce finished product to the aggregate amount of 500,000

239 F.—33

square feet per year by the use of the patents in question before the obligation to pay royalty shall arise, but that it merely gives the right of free use of the patents up to an aggregate use amounting to 500,000 square feet per year before the obligation to pay royalty shall arise.

This contention of the plaintiff with regard to supplemental clause (b) can better be explained by example. Ornamental prism glass is polished on the patent polishing machines. But that kind of glass is also covered by a certain article patent included in the contract. Under plaintiff's contention with regard to supplemental clause (b), if the defendant within a given year had produced 250,000 square feet of ornamental prism glass, it would have exhausted its free allowance of 500,000 square feet, for the reason that both the articles patent and the polishing machine invention had been used in producing the 250,000 square feet, and that therefore the patents had been used to the extent of 500,000 square feet "in the aggregate."

If the plaintiff's construction of supplemental clause (b) is correct, then he is entitled to an accounting of royalties, as it is clear that if the square footage of glass upon which the casting hall patent was used, and the square footage upon which the grinding and polishing machines were used and the square footage produced under the article patent above mentioned be added together, or aggregated, without regard to duplication, then the full allowance provided for in supplemental clause (b) was exceeded by many thousands of square feet in the year 1912–13.

### Defendant's Contention.

The defendant contends that the above-mentioned general provision of section 4 of the contract not only fixes the rate of royalty, but also specifies the fund upon which the royalty is to be assessed, to wit, "the amount received by this company or any subsidiary company for sales of the product in question," and that if that general provision were considered alone it would obligate the defendant to pay to the plaintiff a royalty of 1 per cent. only upon money actually received in payment for sales of the product in question. The defendant also maintains that supplemental clause (b) gives to it the free right, not only to manufacture, but actually to sell, in each year finished product involving the use of the inventions in question to the aggregate amount of 500,000 square feet, and that royalty is to be paid only on actual receipts from sales made above that amount. If the defendant's construction of supplemental clause (b) is correct, then the plaintiff is not entitled to an accounting of royalties.

### Master's Construction.

After a most careful study of the contract, the evidence, and the briefs of counsel, I have reached the following conclusion with regard to the construction of section 4 of the contract: With regard to the above-mentioned general provision I am of opinion that the construction urged by the plaintiff is erroneous, and that the construction contended for by the defendant is substantially correct. Under that general provision the defendant does not promise to pay royalty on its product, nor, indeed, upon its sales, at the rate of 1 per cent. upon its sales prices. What it does promise is this: That it will pay to the plaintiff "1 per cent. of the amount received by this company or any subsidiary for sales of the product in question." With regard to supplemental clause (b) I am of opinion that neither the construction urged by the plaintiff nor that contended for by the defendant is in harmony with the real meaning of the contract.

If we adopt the plaintiff's construction, we must do violence to the plain language of the clause, which provides that "the company shall have free right to use * * * any of the inventions herein referred to up to the produce of 500,000 square feet per year in the aggregate, above which amount the above provided royalty shall be paid." The general provision above referred to requires royalties to be paid on receipts from sales of product. This supplemental clause allows the free use of the inventions up to a certain amount of product in the aggregate, "above which amount [of what? of product] the above provided royalty shall be paid."

One of the elementary rules of construction requires the harmonizing of the various provisions of the instrument if possible. Here we have the word "produce" used twice in the same section of the contract. To me it seems clear that in each instance this word was intended to refer to the same thing, to wit, finished, salable product. The plaintiff's construction would call for an entirely different meaning to be applied to the word "product" as used in supplemental clause (b) from that to be applied to it as used in the general provision. The plaintiff insists that the use of the term "in the aggregate" supports his contention, and disproves the contention that the word "produce" refers to finished output. I cannot agree with this contention. By the use of the term "in the aggregate" the contract excludes any possibility of a contention that the right of free use of the patents shall be so construed as to allow a product of 500,000 square feet from any one patent or group of patents and another 500,000 square feet from another patent or group of patents, but makes it clear that the free allowance shall be limited to 500,000 square feet of product in all—that is, in the aggregate—no matter how many inventions are used.

If we adopt the defendant's construction of supplemental clause (b), and hold that royalties do not become chargeable to any year unless the defendant has actually sold product to the amount of 500,000 square feet, we must do violence to the plain language of the clause, which provides that free use of the patents may be had, not up to sales of product, but up to "the product," of 500,000 square feet. If the defendant's construction be the correct one, the contract is indeed a hard one on the plaintiff, for under that construction the defendant might manufacture for other purposes than for sale 1,000,000 square feet of glass without being accountable to the plaintiff.

It is my conclusion that under section 4 of the contract the defendant has the right in each year to fabricate and finish free of royalty 500,000 square feet in the aggregate of product involving the use of any or all of the inventions covered by the contract, and to do what it pleases with that amount of product, but that if, in any year, that amount of finished product is exceeded, the defendant becomes chargeable with royalties on the excess as that excess is sold and paid for. For example, if 600,000 square feet had been produced in a given year, and 300,000 square feet sold and paid for, the defendant would be liable for royalties, not on the 300,000 square feet, but on that portion thereof which represents the excess of 600,000 over 500,000, to wit, on 100,000 square feet.

## Conclusion with Regard to Royalties.

The burden being on the plaintiff to prove that prima facie he is entitled to royalties, and it appearing from the evidence that, in the only year concerning which evidence in this connection was introduced, the defendant company's aggregate output of product involving the use of any of the patents in question did not exceed 500,000 square feet, I am of opinion, and therefore find, that the plaintiff is not entitled in this case to an accounting of royalties as prayed for.

*Second.* Is the plaintiff entitled to a reassignment to him of certain patents and applications for patents which were assigned by the complainant to the defendant in the said contract, and which cover inventions which have not been substantially used by the defendant?

*Third.* Is the defendant entitled to recover as damages the depreciation in the value of the said patents of which no substantial use has been made?

These two claims will be considered together, for the reason that, if the plaintiff is entitled to a reassignment of patents, he is entitled to damages on account of the depreciation in value of those patents since his right to reassignment accrued. If he is not entitled to a reassignment, he is not entitled to damages.

The plaintiff's claim for reassignment is based on section 9 of the contract, which reads as follows:

"9. In case of any patent assigned to the company by Wadsworth hereunder a period of two years shall have elapsed during which the company shall have made no substantial use of the patent, and there shall have elapsed also

a period of one year after tender to the company of an agreement to license and pay royalty which the company shall have refused, then such patent shall revert to Wadsworth, and the company, upon request from Wadsworth, will duly reassign the same to him, unless the company shall, in writing, claim that its refusal is justified either by the irresponsibility of the proposed licensee or the insignificance in amount or the unreasonableness in condition of the license contract tendered, or by reason of the licensee requiring to be protected in his use of the patent and its being unsafe to license on account of doubt as to infringement. In such case there shall be no reversion unless Wadsworth shall demand in writing an arbitration of the matter, under the conditions therefor hereinafter provided."

The plaintiff claims that he is entitled to a reassignment of all patents covered by the contract and not substantially used by the defendant, on the ground that it is an implied provision of the contract that the defendant will make use of the patents in question. With this contention I cannot agree. It is my opinion that the whole plan of the contract indicates that it was the intention of the parties that it should be optional with the defendant to use or fail to use any of the patents in question as its best judgment might dictate. Section 4 provides for royalty "if it uses any of the inventions," while section 9 sets forth what shall happen in the case of any patent if the company shall for two years "have made no substantial use of the patent." I am of opinion that these two provisions negative any intent to impose a trust obligation to use the patent in question.

The plaintiff also contends that under the terms of section 9, if any license agreement providing a royalty be tendered, and be rejected without the written excuse for rejection being given to the plaintiff, the plaintiff becomes entitled to a reassignment of all substantially unused patents, no matter what patents were included in the tendered license agreement. I cannot agree with this contention. Section 9 provides as follows: "In case of any patent assigned to the company by Wadsworth hereunder a period of two years shall have elapsed during which the company shall have made no substantial use of the patent, and there shall have elapsed also a period of one year after tender to the company of an agreement to license and pay royalty which the company shall have refused, then such patent shall revert to Wadsworth."

Clearly this provision means that if the invention of any given patent is not substantially used, and if an agreement to take license and pay royalty for that patent is tendered and rejected, then that patent shall revert to Wadsworth. The plaintiff contends that there were three instances in which license agreements such as are contemplated by section 9 were tendered to the defendant and rejected by it. These three instances must be dealt with separately. The first is known as the Kahn instance; the second has to do with the Opalite Tile Company; the third relates to the National Glass Machine Engineering Company.

First as to the Kahn incident: There is considerable conflict of testimony with regard to this incident, but I am of opinion that the proofs show the following to be the facts:

(1) Kahn's proposition has not been shown to relate to patents covered by the 1905 contract. On the contrary, the only direct evidence on the question of the identity of the patents in question was the statement of Kahn that his offer related to certain patents known as Wadsworth and Ripley patents, which patents had become the exclusive property of the defendant company under the contract of 1902 and were not included in the contract of October 27, 1905. True, the plaintiff testified that Kahn desired licenses under certain enumerated patents, assigned to the defendant by the 1905 contract; but he (the plaintiff) himself testified that he had no direct information concerning the negotiations under which the Kahn proposition was made, and, further, the plaintiff's contention that the enumerated patents are the ones under which Kahn was seeking licenses is, in my opinion, contradicted by the plaintiff's own written memorandum filed as plaintiff's Exhibit HH, in which, referring to these enumerated contracts, he said to Mr. Kahn: "I understand, however, that you are not particularly interested in this last product."

(2) Kahn is not shown to have made any definite offer of royalty, but seems to have sought the financing of the proposition by the officers of the defendant company.

(3) The plaintiff was a party with the defendant's vice president, Mr. Fisher, to whatever occurred in the way of a rejection of Kahn's proposition, as appears from the plaintiff's letter to Fisher, filed as part of plaintiff's Exhibit L.

(4) There is nothing in the record to indicate that any proposition from Kahn was ever submitted to the defendant's board of directors and rejected by that body. It can hardly be contended that the executive officers of the defendant company had authority to pass upon the granting or rejecting of a license proposition, as it clearly appears that in the other two instances in which license propositions were under consideration the board of directors of the defendant company was reported to by the plaintiff, and formally acted upon the report.

It is my conclusion that the plaintiff is not entitled to any reassignment of patents on account of the Kahn incident.

Second, as to the Opalite Tile Company: The negotiations with this company seem to have been conducted almost exclusively through the plaintiff. On December 10, 1907, he reported to the defendant's board of directors, of which he was a member, that he had had some negotiations with the Opalite Tile Company looking towards a license arrangement. The board of directors authorized him to get a definite proposition on the general line of his report, and directed him to submit such proposition to the defendant. He did secure a definite proposition from Mr. Fry, president of the Opalite Tile Company, but, instead of presenting this to his board of directors, seems to have submitted it to Mr. Fisher, the vice president of the defendant, and at his suggestion to have gone back to Mr. Fry with a counter proposition involving a somewhat larger consideration to the defendant. The evidence seems to indicate that this counter proposition was verbally made and verbally agreed to by Mr. Fry, and possibly by some of the directors of the Opalite Company. On March 7, 1908, the plaintiff reported to his board of directors the terms of that verbal arrangement, and was authorized by that body "to conduct negotiations" along the line of the verbal arrangement. Following this authorization the plaintiff endeavored to induce the Opalite Tile Company to enter into a formal written agreement in line with the verbal arrangement, but was unsuccessful, and on June 27, 1908, he declared that the "deal may be considered as impossible of consummation." No further action was had with regard to this matter.

I am decidedly of opinion that there is no evidence upon which to base a finding to the effect that the defendant company rejected a proffered license agreement offered by the Opalite Tile Company, and therefore find that the plaintiff is not entitled to a reassignment of patents on this account.

Third, as to the National Glass Machine & Engineering Company: The evidence demonstrates clearly that this company was never incorporated. A plan was evolved to incorporate such a company and to assign to it the absolute title to all of the patents held by the defendant, except those of which the defendant was making substantial use. This plan involved, not only the absolute assignment of those patents, but also contemplated the complete annulment of the contract of 1905. The proposed new company was regarded by the defendant's directors as a holding company; it involved an entire reorganization; it carried with it nothing whatsoever in the nature of a proposition involving the taking of a license from the defendant company, and the payment of royalty thereof. The plan was that the holding company was to take absolute title to all of the patents in question. Such a proposition could have no effect upon the rights arising under section 9 of the contract of 1905, which plainly states that the plaintiff's rights to reassignment can arise only upon the refusal of the defendant to enter into an agreement to license and pay royalty. There never was any contract tendered by the National Glass Machine & Engineering Company; there never was any such company. There never was any refusal on the part of the defendant to enter into such an

agreement with such a company, for the reason there never was any such contract tendered.

I am decidedly of opinion that the plaintiff is not entitled to a reassignment of any patents on account of the National Glass Machine & Engineering Company incident.

### Conclusion.

Having reached the conclusion that the plaintiff is not entitled to a reassignment of any of the patents in question on account of any refusal on the part of the defendant company to enter into any tendered agreement for licenses and royalty, I am of opinion, and therefore find, that the plaintiff is not entitled to an accounting of damages because of the depreciation in value of any such patents.

[2] *Fourth.* Is the plaintiff entitled to damages on account of the abandonment by the defendant of certain applications and foreign patents which were assigned by the contract of 1905?

The plaintiff's claim for damages in this connection is based on section 5 of the contract. That section reads as follows:

"5. The company also agrees to pay all expenses incidental to applying for and obtaining all the letters patent herein referred to, either specifically or as future inventions, and also to pay all expenses incidental to experimental or development work in connection with said inventions. The company also agrees to pay all the expenses incidental to any suit which may be brought for the alleged infringement of any one of the patents herein referred to, and the entire expense incidental to any suit which may be brought against the company for alleged infringement of any other patent by reason of the use of any one of the inventions referred to in the patents herein mentioned: Provided, however, that all the expenses which the company hereby agrees to pay shall be authorized by the company."

The proofs established the fact that a number of foreign patents covered by the contract in question were allowed to lapse for failure to pay taxes. It was also shown that in three instances the defendant failed to appeal from the adverse decision of the examiner of patents in connection with applications for United States patents. In one of these instances the plaintiff expressly consented to the action of the defendant. The other two instances have to do with applications numbered 206,355 and 291,398, respectively.

With regard to application 206,355 the plaintiff wrote to Mr. Fisher, saying that, if the defendant company ever goes into the manufacture of sidewalk prism glass, it will be of considerable importance to secure a patent on this invention, if one can be secured. In this letter the plaintiff said: "The question now is, do you wish to take an appeal from the decision of the principal examiner?" To this letter Mr. Fisher replied, saying that the cost of the sidewalk prism glass is practically prohibitive, and further than "we thought best not to go to the expense of an appeal, and hope that will be satisfactory to you." The plaintiff again wrote to Mr. Fisher, saying that "he would advise that the case be appealed, as I think that the invention may, in view of the present trade situation, be of considerable importance later on."

With regard to application 291,398 the plaintiff wrote to Mr. Fisher protesting against the "refusal to further prosecute this case." To this letter Mr. Fisher replied, stating that the defendant had diligently attempted to obtain a patent on this application, but that "it now seems impossible to do so, and that an appeal would be merely a waste of money," and offering to reassign the application to the plaintiff. The plaintiff replied, stating that he not only desires a reassignment of the application in question, but also demands a reassignment to him of all inventions, applications, and patents covered by the contract of October, 1905. Some 9 or 10 months later the defendant executed an assignment of application 291,398 and forwarded it to the plaintiff, but the plaintiff refused to accept it, saying not only that it came too late, but also that it alone would be of no use to him standing by itself, "although I do regard it as of value in connection with other inventions covered by my contract."

I am of opinion that the plaintiff is not entitled to damages on account of the failure of the defendant to take appeals in the matter of these two ap-

plications, for at least two reasons: In the first place, I regard section 5 of the contract as in no way obligating the defendant to appeal from the decision of a patent examiner, if in its business judgment it should deem an appeal unwise. .The provisions of section 5 were clearly intended to express the understanding that the plaintiff would not be called upon to pay any expenses involved in securing patents, but that all such expenses would be borne by the defendant. The last clause of the section, however, makes it equally clear that the question as to whether expenses in a given case should be incurred, was one for determination by the defendant. In the second place, there is nothing in the case to show that an appeal would have brought about a reversal of the decision of the examiner.

With regard to the foreign patents which were allowed to lapse, the evidence is almost wholly documentary. Prior to 1908 the defendant had entered into an arrangement with a Mr. Wells, under which he engaged in an endeavor to dispose of the foreign patents either by way of license or sale. These efforts were unavailing. The matter of the payment of taxes on the foreign patents became a serious proposition and was opened for discussion in the spring of 1908. In this connection the plaintiff wrote to Mr. Fisher, the defendant's vice president, on April 21, 1908, as follows: "As regular taxes falling due in May, I would abandon the German patent 175,988, and only keep the French and Belgian in any case, and these might be dropped if considered necessary. There seem to be no other taxes falling due until next October, which will give us something of a breathing spell; but, unless something is done soon in a practical way to develop these foreign patents, I would favor abandoning all of them. As no one is coming to us to buy, we must go to them."

During the year 1908 and part of 1909 there was considerable correspondence between Mr. Fisher, the plaintiff, and the company's patent attorneys in reference to the dropping of certain of the foreign patents, some of which were covered by the 1905 contract and some were patents which had been assigned to the company in 1902. Throughout this correspondence (filed as Plaintiff's Exhibit G) it is made clear that it was the policy and practice of the defendant to offer to assign to the plaintiff the patents proposed to be dropped, and to drop them only in case he did not see fit to take them over. I find no case in which the plaintiff either objected to the dropping of the patents in question or elected to take an assignment to himself.

On September 22, 1910, Mr. Fisher wrote to the plaintiff as follows: "We are notified by Foster-Freeman that the government taxes on letters patent in Germany 150,365 prismatic fireproof structure 10,750 must be paid on or before November 5th abroad. Accompanying this the following memorandum: 'This is for wire prism glass, and is the only German patent, except the basic patent, still alive. It is included in the German contract.' This is my general idea: If we have a basic patent on pressed prism glass, any one could put wire into it. If there are any other patents in Germany on wire prism glass ahead of our application of the above number, we would have a weak position anyway. If there were none, we could use wire in our pressed prism glass, and nobody else could. Why not stand pat on the basic patent, and not pay this $107.50? This is Mr. Bond's idea and mine, but I think I would like to have yours before deciding. Please answer as early as possible."

On September 24, 1910, the plaintiff replied as follows: "Your letter of the 22d received. In view of the present situation in Europe, I cannot see any use in any longer paying taxes on our foreign patents, except perhaps the basic patents for the manufacture of prism glass."

From this correspondence and from the letter of Mr. Bond to the master, dated October 8, 1914, and by agreement made part of the record in this case, it seems clear to me that the plaintiff gave his consent and approval to the dropping, not only of the specific patents identified in the letters of 1908 and 1909 (Plaintiff's Exhibit G), but of all foreign patents held by the defendant company except the basic patents for the manufacture of prism glass. That those basic patents were not among the number covered by the 1905 contract can hardly be doubted, in view of the fact that from its very organization the

defendant company was engaged in the manufacture of pressed prism glass under patents assigned to it in 1902.

### Conclusion.

I am of opinion, and so find, that the plaintiff is not entitled to an accounting of damages on account of the abandonment by the defendant of applications for United States patents, or on account of the abandonment of any foreign patents assigned by the contract of October, 1905.

[3] *Is the plaintiff entitled to reassignment of stock as prayed for?*

The subjects hereinbefore dealt with have to do with that branch of the case in which the plaintiff seeks relief in connection with the contract of 1905. However, as hereinbefore indicated, the case has another branch bearing on another subject. That second branch will now be considered.

Prior to the year 1909 the defendant company was in a bad financial condition. During the years 1908 and 1909 a reorganization was effected, under which all of the stock outstanding, both preferred and common, was surrendered, and new stock, all of which was common stock, was substituted. Prior to the reorganization the capital stock was $1,000,000, part of which was first preferred and part second preferred and part common. The various stockholders had not made the same actual cash investments in proportion to their respective holdings. There were unpaid accumulated dividends credited to the outstanding preferred stock, which rendered the common stock unsalable. This situation made it necessary that an entirely new adjustment of capital stock be made, in order that there might be placed in the treasury stock which would be attractive to purchasers, to the end that working capital might be secured. A reorganization committee was appointed, of which the plaintiff was chairman. This committee succeeded in working out a plan whereby all of the stock, both preferred and common, should be surrendered, the company recapitalized at $500,000, instead of $1,000,000, part of the new stock (all of which was common stock) issued to the stockholders upon the basis of an adjustment which was worked out by the committee, and the balance of the new stock placed in the treasury to be sold to secure working capital. This arrangement was accepted by the stockholders, and in pursuance thereof the old stock was surrendered and the new stock issued. Under the old organization the plaintiff held $104,000 of stock. Under the reorganization arrangement he surrendered this old stock and took in lieu thereof $15,600 of the new stock.

The plaintiff claims that, notwithstanding the contract of reorganization under which he took as his share $15,600 of stock in the reorganized company capitalized at $500,000, he is entitled to the same proportion of the total capitalization of the reorganized company that he held under the old organization, to wit, 10.4 per cent., or $52,000, and that therefore there should be issued to him $36,400 of stock in addition to the $15,600 which he took under the agreement. His prayer takes the form of a demand for a reissue to him of $36,400 of the stock which he surrendered.

The plaintiff's contention in this regard is based on his claim that he was assured that the new treasury stock was to be applied for certain specific purposes, to wit, the development of certain unused inventions covered by the 1905 contract, but that the stock never was so used, and that, indeed, none of the stock so placed in the treasury was ever sold. The plaintiff therefore claims that he was induced by false representation to make his surrender under the reorganization agreement, and that he is consequently entitled to be put back to his place as the owner of an interest amounting to 10.4 per cent. of the total capitalization of the company.

I find as a matter of fact that the evidence shows that there was a private understanding between the plaintiff and Mr. Fisher, and perhaps Mr. Bond, that a portion of the proposed treasury stock would be used to develop certain unused inventions; but I further find that there is no evidence whatsoever to indicate that these persons, or any of them, had any authority from the stockholders, or even from the directors, to engage in such an arrangement or to make such a promise. The actual contract of reorganization was a written one prepared by the committee of which the plaintiff was chairman,

and was submitted to and signed by the stockholders. That contract, which was issued to the stockholders as a circular, and which is filed as Defendant's Exhibit 19, contained no provision whatsoever which could be construed as an agreement that any portion of the new treasury stock should be used for the development of theretofore unused inventions, or, indeed, for any other specific purpose. The plaintiff, before having the circular printed, submitted it to Mr. Fisher with a paragraph included providing that the treasury stock should in part be used for the development of patents, but this paragraph was stricken out by Mr. Fisher. The plaintiff accepted the circular with the paragraph stricken out, and issued the circular to the stockholders with that paragraph eliminated. The purpose of the reorganization, as expressed in the circular, or contract, was to secure additional capital to develop the business of the company. That written contract was signed by the committee, including the plaintiff, submitted to the stockholders, signed by them, including the plaintiff, and carried into execution by the effectuation of the reorganization.

### Conclusion.

I am of opinion, and therefore find, that the plaintiff is not entitled to have issued to him the stock which he demands. In the first place, neither Fisher nor Bond had authority from either the stockholders or directors' to enter into a private agreement with the plaintiff as to the specific manner in which the development of the company's business should be effectuated, and the plaintiff knew that fact. In the second place, the contract of reorganization was put in writing by the plaintiff himself, submitted to the stockholders by him, and entered into by the stockholders in that form. In the third place, it would be inequitable to the other stockholders, who made their surrenders and took their new stock under the terms of the written contract of reorganization prepared by the committee and signed by all of them, to issue to the plaintiff the additional stock which he demands; for that would give to him a greater interest in the company, in proportion to the interests held by other stockholders, than he agreed to take under that same contract, and would, on the other hand, impair the value of the stock held by those other stockholders.

The undersigned master files in the office of the clerk of your honor's court, with this, his report, the transcript of all the testimony taken before said master, together with all exhibits filed with the master by the parties to this suit.

We have very carefully examined the record in this cause. The evidence abundantly justifies the findings of fact of the court below, and we concur in such findings. It would be difficult to improve upon the statement of the case made by the master. We are satisfied with the master's interpretation of the contract between the parties. The decree below should be affirmed.

Affirmed.

---

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes